UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SANJA DRINKS-BRUDER,

                    Plaintiff,

          v.                                                    22-CV-725-LJV
                                                                DECISION & ORDER

CITY OF NIAGARA FALLS, *et al.*,

                    Defendants.

_____

On September 23, 2022, the *pro se* plaintiff, Sanja Drinks-Bruder, commenced

this action under 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"),

and the New York State Human Rights Law ("NYSHRL").  Docket Item 1.  She alleges

that the defendants discriminated against her because of her race, retaliated against

her, subjected her to a hostile work environment, and violated her right to due process.[1]

*Id.* at 4.  She has sued the City of Niagara Falls (the "City") and nine of its officers and

employees: Mayor Robert Restaino; Corporation Counsel Christopher Mazur; former

Niagara Falls Police Department ("NFPD") Chief Thomas Licata; NFPD Chief John

Faso; NFPD Captains Michael Corcoran and Vincent Granto; NFPD Officer Gregory

Spagnolo; and former Niagara Falls Police Club ("Police Club") Presidents Michael Lee

_____

[1] In the complaint, Drinks-Bruder checked a line indicating that the defendants
also failed to provide her reasonable accommodations.  Docket Item 1 at 4.  Based on
Drinks-Bruder's allegations—which do not include any facts supporting a failure to
accommodate claim, such as an allegation that she is disabled—the Court believes that
Drinks-Bruder likely "mistakenly checked" that line.  *See* Docket Item 15-1 at 10.
Regardless, any failure to accommodate claim is subject to dismissal for failure to state
a claim.  *See Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 368-69 (S.D.N.Y.
2018) (elements of failure to accommodate claim).

and Steven Kerfoot, who also work for the NFPD.  *Id.* at 6-8; *see* Docket Items 15-1 and 16-1 (providing correct names and titles of defendants).

On January 27, 2023, the defendants moved to dismiss the complaint.  Docket Items 15 and 16; on March 27, 2023, Drinks-Bruder responded, Docket Items 20 and 21; and on April 18, 2023, the defendants replied, Docket Items 28 and 29.

For the reasons that follow, the defendants' motions to dismiss are granted in part and denied in part.

## FACTUAL BACKGROUND[2]

In 1993, Drinks-Bruder began working for the NFPD, Docket Item 1 at 2, where she was a member of the Police Club union, *see id.* at 47.  Throughout her employment, she suffered "many . . . instances of racism[] [and] retaliation" that created a "hostile work environment."  *Id.* at 24.  The City "is the entity responsible for" the discrimination, retaliation, and harassment.  *Id.* at 9.  And the individual perpetrators of the "unlawful[,] unethical actions" were "white males and white females" who targeted Drinks-Bruder

---

[2] On a motion to dismiss, the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  In deciding the motion, the court may consider any written documents that are attached to the complaint, incorporated by reference, or integral to it.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

The following facts are taken primarily from the complaint and the documents attached to it, including Drinks-Bruder's administrative charge and the amendments to her administrative charge.  Docket Item 1.  But because the complaint is disjointed and disorganized, some facts are taken from other filings in this action to provide additional context.  Regardless of their source, the facts are viewed in the light most favorable to Drinks-Bruder.

"because [she is] a [B]lack female" who "oppose[s] discrimination" by filing complaints or grievances "all the time."  *Id.* at 42-43, 45.

Generally, the defendants either ignored or failed to adequately address Drinks-Bruder's many grievances.  *See, e.g.*, *id.* at 9 (Restaino); *id.* at 12 (Mazur); *id.* at 15 (Licata); *id.* at 20 (Lee).  But the complaint focuses primarily on events that followed an interaction between Drinks-Bruder and a prisoner in November 2019.

## I.  THE NOVEMBER 2019 INCIDENT AND THE SECTION 72 PROCEEDING

On November 18, 2019, a "white racist violent prisoner" committed "racial hatred discriminatory acts against" Drinks-Bruder.[3]  *Id.* at 23.  Another officer, Spagnolo, "witnessed" the incident and "sided with" the prisoner.  *Id.*

Drinks-Bruder planned "to file a discrimination complaint against" Spagnolo, but when Spagnolo learned about her plan, he "falsified a report about [Drinks-Bruder] to retaliate" against her.[4]  *Id.* at 22-23.  Supervisors Faso and Licata "knew" that Spagnolo had "changed" his report "to harm" Drinks-Bruder, but they "allowed the lies" and decided that Drinks-Bruder's conflicting report was "not true."  *Id.* at 16-17.  Police Club President Lee also "knew" that Spagnolo "lied," *id.* at 20-21, as did City Corporation Counsel Mazur, who represented Spagnolo in connection with the incident, *id.* at 13.

---

[3] As best the Court can tell, Drinks-Bruder attempted to file a report against the prisoner.  Docket Item 20 at 10.  In January 2021, she learned "that [the] charges had been sealed and lowered by the City of Niagara Falls Court" and that the City "asked that all charges be dropped against the racist prisoner[, which] they were."  *Id.* at 10-11.

[4] Drinks-Bruder does not describe the content of the falsified report in her complaint.  *See* Docket Item 1.  But it seems that Spagnolo reported that Drinks-Bruder "said [something] to the white female prisoner [that] caused her to take the physical actions against [Drinks-Bruder]."  Docket Item 20 at 9.

In December 2019, Licata told Drinks-Bruder that she "needed a mental evaluation because of" the November incident.[5]  *Id.* at 14.  But Drinks-Bruder "refused an evaluation."  *Id.*  In fact, she found Licata's suggestion that she was "mental" to be discriminatory and insulting.  *Id.*; *see id.* at 55 (alleging that the City used Drinks-Bruder's "normal reaction" to "a discriminatory racial hatred incident" to suggest she has a "mental disorder").

Nevertheless, Licata and Faso persisted in their attempt to have Drinks-Bruder take "a mental and physical exam[]."  *Id.* at 15.  On January 10, 2020, Drinks-Bruder "was forced to go to a[n] unscheduled . . . meeting" with no notice.  *Id.* at 36.  When she arrived at Faso's office, she learned that the meeting was related to the requested section 72 evaluation.  *Id.*  More specifically, the City, Licata, and Faso said that the meeting was convened because Drinks-Bruder's "many grievances" raised concerns that she was "unfit for duty."  *Id.*  But Drinks-Bruder was fit for duty, and there was no evidence to the contrary.  *Id.* at 43; *see id.* at 15 (alleging that "no facts were given" to support the need for a section 72 evaluation).

Lee, who was at the meeting, told Drinks-Bruder that he "knew nothing about" the proceeding and that the Police Club "did not know what was going on."  *Id.* at 36.  Drinks-Bruder scheduled the section 72 exam because the City and the Police Club told

---

[5] Based on Drinks-Bruder's other allegations, the Court assumes that Licata asked Drinks-Bruder to undergo an evaluation under New York Civil Service Law § 72 ("section 72").  *See* Docket Item 1 at 14-15.  Under section 72, an "appointing authority" who believes that "an employee is unable to perform the duties of . . . her position by reason of a disability . . . may require such employee to undergo a medical examination."  N.Y. Civ. Serv. Law § 72(1).  The appointing authority must give the employee "[w]ritten notice of the facts" that are the basis for the examination."  *Id.*  If the employee is found unfit "to perform the duties of . . . her position," she "may be placed on a leave of absence."  *Id.*

her that she could not refuse.  *Id.*  That was false, however:  Drinks-Bruder "ha[d] a right to [refuse] any mental or medical exams when there [were] no true facts" showing that such exams were necessary.  *Id.*

After she scheduled the exam, Drinks-Bruder received paperwork, including "section 72 proceeding law" and an unsigned "copy of the facts," from Faso.  *Id.* at 36-37.  Lee gave Drinks-Bruder a copy of an email dated January 6, 2020.  *Id.* at 37.  That email, which showed that the Police Club "g[a]ve the City an okay to proceed with the section 72 proceeding," contradicted Lee's earlier statement that he did not know about the proceeding.  *Id.*

Shortly after the January 10 meeting, Drinks-Bruder did not attend the scheduled section 72 exam, and she was suspended without pay beginning on January 13, 2020.[6]  *See id.* at 11.  Drinks-Bruder requested an investigation into the circumstances of her suspension, but her request was denied.[7]  *Id.* at 16.  Instead, the City initiated disciplinary proceedings against her under New York Civil Service Law § 75 ("section 75").[8]  *See id.* at 18-19.

---

[6] At some point—Drinks-Bruder does not say when—Faso and Licata took Drinks-Bruder's "issued duty weapon for no reason."  Docket Item 1 at 17.  The Court assumes Drinks-Bruder's weapon was taken when she was suspended.

[7] At some point, under the Freedom of Information Law ("FOIL"), Drinks-Bruder requested "documents that [the City] supposedly [was] using against her" in connection with the section 72 proceeding.  Docket Item 1 at 24-25.  But the City "failed to provide" those documents.  *Id.*; *see* Docket Item 20 at 12.

[8] Section 75 "establishes protections and procedures for covered employees facing discipline and provides that they 'shall not be removed or otherwise subjected to any disciplinary penalty . . . except for incompetency and misconduct shown after a hearing upon stated charges.'"  *City of Long Beach v. N.Y. State Pub. Emp. Rels. Bd.*, 39 N.Y.3d 17, 23 n.1, 198 N.E.3d 478, 481 n.1 (2022) (quoting N.Y. Civ. Serv. Law § 75(1)).

## II.    THE SECTION 75 PROCEEDING

Faso initially told Drinks-Bruder that "she could return to work after [her] suspension ended in February 2020."[9]  *Id.* at 17.  But he later changed his mind when Mazur "directed" him "not to let [Drinks-Bruder] return to work."  *Id.* at 12, 17.  So every 30 days, Faso "would force" Drinks-Bruder to appear "just to suspend her again for refusing to" sit for the section 72 exam.  *Id.* at 16.  That pattern continued until December 2021.[10]  *Id.* at 17-18.  As a result of her suspensions, Drinks-Bruder suffered financial and professional harm and "emotional stress."  *Id.* at 24, 44.

In January 2022, Faso sent Drinks-Bruder a letter informing her that she should "not return to work" and should "attend the scheduled March 2[,] 2022 civil service [section] 75 hearing."  *Id.* at 18.  The letter also informed Drinks-Bruder that she "would be removed from the current unpaid leave" and "placed on administrative leave."  *Id.*

## III.    USE OF ACCRUED VACATION DAYS

From April 9 to May 4, 2020—early in the period of Drinks-Bruder's suspension— Lee "falsif[ied] records" and used 18 of Drinks-Bruder's "accrued [vacation] days to pay [her] without [her] authorization[,] which he needed."  *Id.* at 20, 52-53.  Drinks-Bruder believed that she "was to get paid by the state through unemployment" during that period because Mazur and Faso had told her she "could not return to work in April

---

[9] Technically, Corcoran was "in charge" of the section 72 proceeding and section 75 proceeding.  Docket Item 1 at 19.  But "[a]ll [he] did was . . . agree[] with [Faso's] unlawful actions."  *Id.*

[10] In September 2021, Corcoran filed a complaint against Drinks-Bruder alleging that she "refused" to "undergo a medical and mental health evaluation" fourteen times.  Docket Item 20 at 15.

2020." *Id.* at 53.  Mazur "knew" that Lee and Faso used Drinks-Bruder's "accrued days to pa[y] [her] illegally."  *Id.* at 12-13.

In April 2021, the City and the Police Club "acknowledged" that "what they did with the accrued vacation days was "incorrect."  *Id.* at 50-51.  But using Drinks-Bruder's vacation days was intentional, not a "misunderstanding."  *Id.* at 52.  And Lee, Faso, and Mazur knew "the correct information."  *Id.*

## IV.   NEGOTIATIONS WITH THE CITY

At some point in 2022, Drinks-Bruder and the City—apparently represented by Mazur, *see id.* at 12—reached an agreement to settle one of her discrimination claims, *id.* at 9-10.  The City verbally agreed to pay Drinks-Bruder approximately $15,000, but it then "refused to sign" the settlement agreement because Drinks-Bruder "refused to accept an unlawful decertification" by Faso.[11]  *Id.*

The City and Drinks-Bruder next discussed a "global settlement" that would require Drinks-Bruder to "drop all possible charges against the City," but that settlement "would not remove the unlawful decertification."  *Id.* at 10.  The City indicated that it "would not deal in good faith" unless Drinks-Bruder "admitted" that her claims were the result of "a misunderstanding."  *Id.* at 53.  And it refused to include in the terms of the settlement "another benefit" Drinks-Bruder was "eligible for," "the 341(j)."[12]  *Id.* at 53-54. So Drinks-Bruder and the City could not reach an agreement to resolve her claims.  *Id.*

---

[11] The Court assumes that Drinks-Bruder is referring to her termination.  *See* Docket Item 16-1 at 5 (explaining that "[t]he City terminated [Drinks-Bruder] in 2022").

[12] Under New York Retirement & Social Security Law § 341(j), retiring state employees may receive "credit for each day of accumulated unused sick leave" in certain circumstances.

## V.     OTHER ALLEGATIONS

The complaint includes several other scattered allegations.

Corcoran "harassed" Drinks-Bruder "many times":  He "t[ook] away" her overtime and "g[ave] it" to others, told her that she "pisses him off" and swore at her, threatened her with "rep[e]rcussions," and punished her for the actions of her co-workers.  *Id.* at 19.

In July 2019, Granto "forced" Drinks-Bruder to work in dangerous conditions "with the mentally ill at Niagara Falls Memorial Medical Center."  *Id.* at 23.  Lee "agreed" that Drinks-Bruder must work in those conditions.  *Id.* at 21.  Drinks-Bruder was told "to shoot [the patients] if [she] had to" protect herself because "[o]nly the medical staff were allowed the keys" to open the "locked rooms that held the mentally ill."  *Id.* at 23-24.  But in 2021, she learned that "three white officers . . . each had a key . . . to safely exit the locked room[s]."  *Id.*

Lee "allowed" Drinks-Bruder's yearly "uniform allowance" of $1,600 "to be taken away" and told her "it was now part of [her] salary."  *Id.* at 21.  At some point, Lee "lied to a sheriff" and "stop[ped] court papers from going to the right party."  *Id.*

In addition, the City "allow[ed] a white male police officer [to return] to work from a paid administrative leave . . . after he was charged for domestic violence."  *Id.* at 11.  Similarly, the City and the Police Club failed to follow "proper procedures" with Drinks-Bruder—something that "they do not do with white parties."  *Id.* at 51-52.

## PROCEDURAL BACKGROUND

Drinks-Bruder pursued her grievances and complaints through the administrative process, but they were not resolved to her satisfaction.  *See id.* at 43 (alleging that Drinks-Bruder reported "unlawful actions" to the New York State Public Employment

Relations Board and the New York State Division of Human Rights ("NYSDHR"), that

her reports were not "fully addressed," and that "discrimination is allowed to continue").

More specifically, on January 8, 2021, Drinks-Bruder filed a charge with the NYSDHR

and the Equal Opportunity Employment Commission ("EEOC").  *Id.* at 3, 33.  She listed

as respondents the City, Licata, and Faso.  *See id.* at 30.  Drinks-Bruder amended her

administrative charge on March 4, 2021, *id.* at 47, and April 5, 2021, *id.* at 32.

Eventually, the NYSDHR "found . . . probable cause against" the City.  *Id.* at 10.

It suggested scheduling a hearing in January 2023, but due to the financial hardship she

was suffering, Drinks-Bruder "ask[ed] for a right to sue letter" so she could pursue her

claims in federal court.  *Id.*  So on June 28, 2022, the EEOC dismissed Drinks-Bruder's

charge for that reason.  *Id.* at 28.  A few months later, Drinks-Bruder commenced this

action.

## **LEGAL PRINCIPLES**

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Although the

statute of limitations is ordinarily an affirmative defense that must be raised in the

answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the

defense appears on the face of the complaint." *Conn. Gen. Life Ins. Co. v. BioHealth Labs., Inc.*, 988 F.3d 127, 131-32 (2d Cir. 2021) (citation omitted).

## <u>DISCUSSION</u>

The defendants argue that Drinks-Bruder's complaint must be dismissed in full. Docket Items 15-1 and 16-1. In response, Drinks-Bruder says that all her claims survive, but she largely fails to address the defendants' arguments. *See* Docket Items 20 and 21. Instead, she asserts that she "will provide" proof of her allegations "during discovery," Docket Item 20 at 2, 4; makes conclusory allegations of unlawful conduct without factual details, *see, e.g.*, *id.* at 2 ("The facts are supported by the actions of the defendants who are all white against me who is a [B]lack person."); *id.* at 8 ("I was denied everything while all other white employees who requested would receive it even if I had seniority."); *id.* at 11 ("Every day I went to work I was discriminated against in some[ ]way."); Docket Item 21 at 2 ("[The defendants discriminated] against me because I am a [B]lack female who wanted to be treated equally and fairly and they did not want that."); and complains about the conduct of one of the defense attorneys, Docket Item 21 at 2-7.[13]

For the reasons that follow, some of Drinks-Bruder's claims survive, other claims are dismissed, and the remaining claims are subject to dismissal.

---

[13] She also requests oral argument. Docket Item 20 at 6. That request is denied.

I.      **TITLE VII**

Title VII prohibits employers from discriminating against employees based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e *et seq*.  It also prohibits retaliation when an employee opposes such discrimination.  *Id.*

A.      **Individual Defendants**

Although the complaint is unclear, the Court assumes that Drinks-Bruder asserts Title VII claims against Restaino, Mazur, Licata, Faso, Corcoran, Granto, Spagnolo, Lee, and Kerfoot (the "individual defendants") in their official and individual capacities. *See* Docket Item 1.  Both sets of claims fail.

First, "[a] suit for damages against a municipal officer in [his] official capacity is the equivalent of a damage suit against the municipality itself." *Escobar v. City of New York*, 2007 WL 1827414, at *3 (E.D.N.Y. June 25, 2007) (emphasis omitted) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  "Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding [Title VII] claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources."  *Id.* (citation and internal citation marks omitted); *see Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 410-11 (E.D.N.Y. 2010) (dismissing official-capacity Title VII claims against individual defendants as "redundant" and noting that "[a]lthough the Second Circuit has not yet explicitly decided the issue, many recent decisions in this Circuit have rejected Title VII official[-]capacity claims" (citations and internal quotation marks omitted)).  Because Drinks-Bruder has sued the City itself, her official-capacity Title VII claims against its employees and officers are duplicative.

11

Therefore, in the interest of judicial economy, the official-capacity Title VII claims against the individual defendants are dismissed without leave to amend.

Second, "[i]t is well-settled that there is no individual liability under Title VII." *Felton v. Monroe Cmty. Coll.*, 579 F. Supp. 3d 400, 406 (W.D.N.Y. 2022) (citing *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012)).  In other words, defendants in their individual capacities cannot be held liable for violating Title VII.  *Id.*  Drinks-Bruder's individual-capacity Title VII claims against the individual defendants therefore are dismissed without leave to amend because any amendment would be "futile."  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Because Drinks-Bruder's Title VII claims against the individual defendants are dismissed without leave to amend, the Court considers only the City's additional arguments for dismissal of Drinks-Bruder's Title VII claims.

### B.    Failure to Exhaust

"Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court." *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citations omitted).  Under a narrow exception to the exhaustion requirement, "claims not raised in an [administrative charge] may still be part of the complaint later filed in federal court if they are reasonably related to the claim filed with the agency."  *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (citation and internal quotation marks omitted).  A claim is reasonably related "if the conduct complained of would fall within the scope of the [agency] investigation which can reasonably be expected to grow out of the charge that was made."  *Id.* (citation omitted).

The City argues that Drinks-Bruder's Title VII claims are "barred to the extent [they are] based on incidents or events that were not alleged in her administrative [charge]." Docket Item 15-1 at 18-19. It specifically says that Drinks-Bruder could not possibly have exhausted her Title VII claims based on events that occurred after January 8, 2021—the day she filed her administrative charge. *Id.* But the Court finds that because the post-January 2021 conduct about which Drinks-Bruder complains resulted from her refusal to undergo a section 72 evaluation, it is reasonably related to the allegations in the administrative charge. That conduct therefore would "fall within the scope" of an investigation into the allegations in Drinks-Bruder's administrative charge, which focused on the section 72 proceeding and subsequent events. *See Littlejohn*, 795 F.3d at 322. For that reason, claims directly arising from that conduct need not have been included in Drinks-Bruder's initial administrative charge.

Drinks-Bruder's Title VII claims against the City therefore are not subject to dismissal for failure to exhaust administrative remedies.

### C.    Timeliness

"A plaintiff seeking to assert an [employment] discrimination claim must first file an administrative charge with the EEOC or an equivalent agency within three hundred days after the alleged unlawful employment practice." *Zabar v. N.Y.C. Dep't of Educ.*, 2020 WL 2423450, at *4 (S.D.N.Y. May 12, 2020) (citation and internal quotation marks omitted). "Failure to do so renders the claim time[ ]barred." *Id.* (citation omitted); *see Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[G]enerally[,] if [a] plaintiff [alleging a federal employment discrimination claim] has initially filed an

administrative claim in a state whose laws prohibit such discrimination, the limitations period for filing an action is 300 days after the alleged unlawful practice.").

The Supreme Court has distinguished between two different types of "unlawful employment practice[s]": "discrete discriminatory acts and hostile work environment claims." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). "Discrete acts of discrimination include 'termination, failure to promote, denial of transfer, or refusal to hire,' as well as disciplinary actions such as suspensions and the denial of training." *Ellis v. Delphi Corp.*, 2009 WL 3671371, at *3 (W.D.N.Y. Oct. 29, 2009) (citing *Morgan*, 536 U.S. at 114). The statute of limitations is "strictly enforced" for such claims and applies "to each discrete act of alleged discrimination." *Id.* at *2-3. A hostile work environment claim, on the other hand, "is a wholly separate cause of action designed to address other types *of* work[]place behavior, like constant jokes and ridicule or physical intimidation." *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 648 (W.D.N.Y. 2014) (citation and emphasis omitted). Unlike "discrete acts, a single act of harassment may not be actionable on its own." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Morgan*, 536 U.S. at 115).

The statute of limitations operates differently for claims based on discrete adverse employment actions and those based on a hostile work environment. *See Morgan*, 536 U.S. at 122. For claims based on discrete acts, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. "The charge, therefore, must be filed within the . . . 300-day time period after the discrete discriminatory act occurred." *Id.* "A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are

part of the same unlawful employment practice and at least one act falls within the [limitations] time period." *Id.* at 122.

The City argues that because Drinks-Bruder filed her administrative charge on January 8, 2021, her claims based on events that occurred before March 14, 2020— 300 days earlier—are untimely. Docket Item 15-1 at 18. Drinks-Bruder responds that all her claims are timely under the continuing violation doctrine. Docket Item 20 at 8-9. But the continuing violation doctrine simply does not apply to discrimination and retaliation claims. *See Morgan*, 536 U.S. at 113. Accordingly, Drinks-Bruder's Title VII discrimination and retaliation claims must be based on events that occurred on or after March 14, 2020. On the other hand, Drinks-Bruder may attempt to state a Title VII hostile work environment claim based on events that occurred before that date if those events are "part of [an] unlawful employment practice" that continued until at least March 14, 2020. *See id.* at 122.

### D.    Failure to State a Claim

#### 1.    Racial Discrimination

To state a *prima facie* case of racial discrimination under Title VII, a plaintiff must show "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and [(4) that she has] some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn*, 795 F.3d at 307. If the plaintiff meets her burden, the defendant is presumed to have unlawfully discriminated against her, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant makes that showing,

the burden shifts back to the plaintiff to show that the defendant's stated reason is pretextual.  *Id.* at 307-08.

The City argues that Drinks-Bruder has failed to state a *prima facie* case of Title VII race discrimination because (1) she does not allege that she suffered an adverse employment action and (2) her allegations do not "giv[e] rise to an interference of discrimination."  Docket Item 15-1 at 13-17.

> a.    *Adverse Employment Action*

 An adverse employment action is "a materially significant disadvantage with respect to the terms of the plaintiff's employment."  *Littlejohn*, 795 F.3d at 312 n.10 (alterations, citation, and emphasis omitted).  An action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to be adverse.  *Id.* (citation omitted).  "Examples of materially significant disadvantages include termination, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities."  *Id.* (alternations, citation, and internal quotation marks omitted).

According to the City, Drinks-Bruder alleges only "a variety of workplace incidents and interactions, none of which meet the standard for [a] materially adverse action."  Docket Item 15-1 at 13-17.  Indeed, the vast majority of Drinks-Bruder's allegations—including her allegations that the defendants failed to adequately address her grievances, that she was given dangerous assignments, and that Corcoran yelled at her—clearly are not adverse actions.  *See Littlejohn*, 795 F.3d at 312 n.10.  Nor is the request that Drinks-Bruder undergo a section 72 evaluation.  *Cf. Baum v. County of Rockland*, 337 F. Supp. 2d 454, 473-74 (S.D.N.Y. 2004) (finding that allegedly "baseless" request for section 72 exam was not an adverse employment action under

Age Discrimination in Employment Act and Americans with Disability Act), *aff'd*, 161 F. App'x 62 (2d Cir. 2005) (summary order).

The only allegations that even arguably rise to the level of an adverse action are Drinks-Bruder's suspension and, perhaps, the defendants' misuse or denial of certain benefits.  But even assuming that those are adverse actions, Drinks-Bruder still has not plausibly alleged that those actions were motivated by her race.

> b.      *Inference of Discriminatory Motivation*

A plaintiff alleging racial discrimination under Title VII "need only give plausible support to a minimal inference of discriminatory motivation" behind an adverse employment action.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015).  "An inference of discrimination can arise from circumstances including, but not limited to, [1] 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; [2] its invidious comments about others in the employee's protected group; [3] the more favorable treatment of employees not in the protected group; [4] the sequence of events leading to the plaintiff's discharge'[; or 5] . . . when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class."  *Littlejohn*, 795 F.3d at 312-13 (citations omitted).

While the complaint mentions Drinks-Bruder's race or the races of other individuals several times, all allegations of discriminatory motivation are conclusory.  For example, Drinks-Bruder suggests that she was asked to undergo a section 72 evaluation because she is Black, but she provides no details to support that allegation, such as comments about her race made by her co-workers or supervisors.[14]  Nor does

---

[14] In her response, Drinks-Bruder alleges that in December 2019, she told her supervisors that she "ha[s] been called a n[*****] before by . . . inmates[ and] citizens

she sufficiently allege that white employees were treated differently than she was treated.  Rather, she vaguely alleges that white NFPD officers were given privileges or benefits she was denied without providing any details suggesting she and those officers were similarly situated.  What is more, Drinks-Bruder's allegations make clear that she was suspended and denied benefits because she refused to undergo a section 72 evaluation, not because she is Black.

In short, Drinks-Bruder gives this Court no reason—other than her own say-so—to think the defendants discriminated against he based on her race.  And her own say-so, bereft of any factual support, does not suffice to state a claim.  Drinks-Bruder's Title VII race discrimination claim therefore is subject to dismissal.

### 2.    Retaliation

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (citation and internal quotation marks omitted).  "'Protected activity' includes opposition to a discriminatory employment practice."  *Hubbard v. Total Commc'ns., Inc.*, 347 F. App'x 679, 680-81 (2d Cir. 2009) (summary order).

---

and dealt with it," but that "it is different" "when your co[-]worker is involved."  Docket Item 20 at 9.  But she does not allege that any of her co-workers directed racial slurs at her or even that they encouraged prisoners to do so.  *See id.*

The City argues that Drinks-Bruder "fails to identify any protected activity that she engaged in" or "any connection between any [allegedly] protected activity and an adverse employment action."  Docket Item 15-1 at 12.  More specifically, it says that the only protected activity she alleges is "the filing of her administrative [charge]" on January 8, 2021, and that "she makes no allegations of retaliatory conduct that resulted from her filing that administrative [charge]."  *Id.*

Drinks-Bruder responds that the City "threaten[ed]" that she "would lose benefits plus [her] medical insurance" if she "did not drop [her] complaints and just retire." Docket Item 20 at 4.  That seems to be a reference to her 2022 settlement negotiations with the City, in which the City refused to reach an agreement unless Drinks-Bruder withdrew her complaints.  *See* Docket Item 1 at 9-10, 53-54.  That allegation raises a plausible *prima facie* case of retaliation:  Drinks-Bruder alleges that the City threatened her with "a material loss of benefits" unless she withdrew her protected administrative charge.[15]  *See Littlejohn*, 795 F.3d at 312 n.10.

Because the City has not offered a non-retaliatory reason for that alleged threat, Drinks-Bruder's Title VII retaliation claim against the City may proceed.

### 3.    Hostile Work Environment

"Under Title VII, an employee seeking to bring a hostile work environment claim must show [1] that she . . . is a member of a protected class; [2] that she suffered

---

[15] The City replies that it "is entirely false" that Drinks-Bruder was unable to retire as a result of the settlement negotiations.  *See* Docket Item 29 at 7-8.  But at this stage, the Court must view the facts—including Drinks-Bruder's allegation that the City threatened to withhold benefits unless she withdrew her administrative charge—in the light most favorable to Drinks-Bruder.

unwelcome harassment; [3] that she was harassed because of her membership in a protected class; and [4] that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Courts look at the totality of the circumstances and examine factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

The City argues that Drinks-Bruder fails to state a Title VII hostile work environment claim because she "does not allege a single comment or action . . . that had anything to do with her race." Docket Item 15-1 at 11. And the City says that regardless, "none of the conduct alleged . . . is sufficiently severe or pervasive enough that a reasonable person would find it hostile or abusive." *Id.*

Even assuming that the conduct Drinks-Bruder alleges was sufficiently severe, her hostile work environment claim fails because, as discussed, she has not plausibly alleged any connection between her race and the defendants' conduct. *See infra* at 17-18. Rather, she makes only conclusory allegations that the defendants treated her badly because of her race. In other words, she has not raised an inference that she

was "harassed because of her membership in a protected class."  *See Monterroso*, 591 F. Supp. 2d at 584.

Drinks-Bruder's Title VII hostile work environment claim therefore is subject to dismissal.

## II.    SECTION 1983 CLAIMS (DUE PROCESS)

Drinks-Bruder alleges that she has a viable section 1983 claim because the defendants violated her right to due process.  Docket Item 1 at 4.

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).  To establish liability against a government official under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

### A.    Failure to State a Claim

"The Due Process Clause is violated when a claimant is deprived of a protected liberty or property interest without adequate process."  *Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019).  "Constitutional due process requires, prior to being deprived of a significant property interest such as permanent civil service employment: (1) 'oral or written notice of the charges against the employee'; (2) 'an explanation of the employer's evidence'; and (3) 'an opportunity to present the employee's side of the

21

story' and 'to present reasons, either in person or in writing, why the proposed action should not be taken.'"  *Coles v. Erie County*, 629 F. App'x 41, 43 (2d Cir. 2015) (summary order) (alterations omitted) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)).

> To evaluate whether a plaintiff received due process, one of two standards may apply.  If the deprivation is the result of "unauthorized acts by state employees," the Fourteenth Amendment is not violated "so long as the State provides a meaningful post-deprivation remedy.  If the deprivation "occurs in the more structured environment of established State procedures, rather than random acts, the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process."

*Langton v. Town of Chester*, 168 F. Supp. 3d 597, 606 (S.D.N.Y. 2016) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996).  For purposes of determining which of those two standards apply, "acts of high-ranking officials who are ultimate decision-maker[s] and have final authority over significant matters, even if those acts are contrary to law, should not be considered random and unauthorized conduct for purposes of a procedural due process analysis." *Mullen v. Village of Painted Post*, 356 F. Supp. 3d 275, 282 (W.D.N.Y. 2019) (quoting *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006)).  In other words, if a due process claim arises from the acts of high-ranking officials with decision-making authority, the second standard applies and the mere availability of post-deprivation procedures does not satisfy due process.

The defendants argue that "it is entirely unclear exactly how [Drinks-Bruder] believes her due process rights were violated."  Docket Item 15-1 at 19.  But mindful of its obligation to construe *pro se* complaints liberally, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006), the Court assumes that Drinks-Bruder intends to assert that the defendants failed to provide her due process when they

22

suspended—and ultimately terminated—her under section 75 for her refusal to undergo a section 72 evaluation.

"The Second Circuit recognizes that continued public employment covered by [section] 75 gives rise to a property interest protected by the Due Process Clause." *Marentette v. City of Canandaigua*, 351 F. Supp. 3d 410, 418-19 (W.D.N.Y. 2019) (collecting cases). The defendants argue that a due process claim based on the section 72 and section 75 proceedings "necessarily fails because of the availability of post-deprivation review pursuant to Article 78."[16] Docket Item 15-1 at 20.

That argument is unconvincing. Drinks-Bruder alleges that Faso—then the Chief of the NFPD—and her other supervisors were responsible for the section 72 and section 75 proceedings and her eventual termination. *See* Docket Item 1 at 9-10, 19. Faso, as Chief, presumably had "final decision-making authority regarding [Drinks-Bruder's] employment" because her termination was not a "random and unauthorized" act. *See Mullen*, 356 F. Supp. 3d at 282. "Accordingly, a post-deprivation procedural safeguard such as an Article 78 proceeding does not automatically satisfy due process." *Id.* (citation and internal quotation marks omitted).

At this early stage, the Court accepts as true Drinks-Bruder's allegation that she was not provided sufficient evidence of the facts giving rise to the section 72 proceeding. *See* Docket Item 1 at 15, 43. That allegation raises a plausible due process claim. *See Coles*, 629 F. App'x at 43.

_____

[16] "Under New York law, Article 78 of the Civil Practice Law and Rules . . . establishes a streamlined process for challenging the determinations of public bodies and administrative agencies." *Doe v. New York University*, 537 F. Supp. 3d 483, 490 (S.D.N.Y. 2021).

Drinks-Bruder's due process claim therefore may proceed.

### B. Individual Defendants

The individual defendants argue that the section 1983 claims against them fail because (1) they are not state actors, Docket Item 16-1 at 13; (2) they are entitled to qualified immunity, Docket Item 15-1 at 23-24; and (3) certain individual defendants were not personally involved in the conduct at issue, *id.* at 25-26.

First, the individual defendants—who were employed by the City at the time of the events at issue and interacted with Drinks-Bruder in their capacities as City employees—cite no authority to support their conclusory argument that they "are not state actors and were not acting under the color of law." *See* Docket Item 16-1 at 13. Second, the Court finds that a qualified immunity argument is premature at this early stage. *See McKenna v. Wright*, 386 F.3d 432, 434, 436 (2d Cir. 2004) (noting that a motion to dismiss on qualified immunity grounds "may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief" (citation and internal quotation marks omitted)); *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) ("Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." (alterations, citations, and internal quotation marks omitted)); *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) ("We caution, however, that it is generally unwise to venture into a qualified immunity analysis at the pleading stage . . . .").

But Drinks-Bruder has not alleged that most of the individual defendants were personally involved in the decision to suspend and terminate her. *See generally* Docket

Item 1.  In fact, the only individual defendants alleged to have been involved were Faso, Licata, and Corcoran.  *See id.*  Drinks-Bruder's due process claims against Restaino, Mazur, Granto, Spagnolo, Lee, and Kerfoot therefore are subject to dismissal.

## III.   NYSHRL CLAIMS

Like Title VII, the NYSHRL prohibits employment discrimination as well as retaliation against employees who oppose such discrimination.  N.Y. Exec. Law § 296.

### A.   Failure to State a Claim

Generally, "[e]mployment discrimination claims brought under the NYSHRL are analyzed identically to claims under . . . Title VII."  *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 316 n.2 (2d Cir. 1999).  The exception is NYSHRL hostile work environment claims, which require a plaintiff to show that she was subjected to "inferior terms, conditions[,] or privileges of employment because of [her] membership in one or more . . . protected categories."  N.Y. Exec. Law § 296(1)(h).

For the reasons stated above, Drinks-Bruder has stated a retaliation claim under the NYSHRL.  *See supra* at 18-19; *see also Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 251 (E.D.N.Y. 2015) (articulating standard for retaliation claim under both Title VII and the NYSHRL).  But she has failed to state a race discrimination claim under the NYSHRL, *see supra* at 15-18, as well as a state law hostile work environment claim, *see supra* at 19-21—even considering the NYSHRL's more lenient standard.

### B.   Election of Remedies

The defendants argue that Drinks-Bruder's NYSHRL claims are barred by the election of remedies doctrine.  Docket Item 16-1 at 14-15; *see* N.Y. Exec. Law § 297(9)

("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court . . . *unless* such person has filed a complaint . . . with any local commission on human rights . . ." (emphasis added)).  But that doctrine applies only when an administrative agency dismisses a charge on the merits, *see* N.Y. Exec. Law § 297(9), which the NYSDHR did not do here, *see* Docket Item 1 at 10.  So it seems that the election of remedies doctrine does not bar Drinks-Bruder's claims here.

### C.    Individual Defendants

Finally, the individual defendants argue that they cannot be held liable under the NYSHRL.  Docket Item 15-1 at 25-26; Docket Item 16-1 at 13-14.

"Historically, under the NYSHRL, liability for employment discrimination could be imposed on an individual if the individual qualifies as an 'employer.'"  *Belyea v. City of Glen Cove*, 2023 WL 1929787, at *2 (E.D.N.Y. Feb. 10, 2023) (internal quotation marks omitted) (collecting cases).  "In a recent opinion, however, the New York Court of Appeals clarified that the NYSHRL 'does not render employees liable as individual employers.'"  *Bonaffini v. City Univ. of N.Y.*, 2021 WL 2895688, at *2 (E.D.N.Y. July 9, 2021) (quoting *Doe v. Bloomberg, L.P.*, 36 N.Y.3d 450, 457, 143 N.Y.S.3d 286, 291 (2021)).  "Nevertheless, . . . the NYSHRL . . . offer[s] a second type of individual liability":  An individual may be held liable for aiding, abetting, inciting, compelling, or coercing the doing of a prohibited act.  *Id.* (citing N.Y. Exec. Law § 296(6)).

Here, Drinks-Bruder's only surviving NYSHRL claim is based on the City's alleged threat to deny her benefits unless she withdrew her complaints.  Drinks-Bruder did not allege that any of the individual defendants were involved in that conduct in any way.  *See generally* Docket Item 1.  Her NYSHRL claims against the individual

26

defendants therefore are subject to dismissal because she has not plausibly alleged that those defendants aided or abetted that conduct.

## IV.   PUNITIVE DAMAGES

Finally, the defendants argue that Drinks-Bruder's claim for punitive damages must be dismissed.  Docket Item 15-1 at 27.  "Although punitive damages are not available against municipalities or against individuals sued in their official capacities, punitive damages may be awarded against defendants sued in their individual capacities."  *Lin v. County of Monroe*, 66 F. Supp. 3d 341, 362 (W.D.N.Y. 2014) (citation omitted).  Drinks-Bruder's punitive damages claims against the City and against the individual defendants in their official capacities therefore are dismissed without leave to amend.  But her punitive damages claims against the individual defendants survive to the extent she has pleaded otherwise viable claims against those defendants.

## V.   LEAVE TO AMEND

Generally, the court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."  *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *see also Cuoco*, 222 F.3d at 112 ("A *pro se* complaint is to be read liberally.  Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999))).  But leave to amend pleadings may be denied when any amendment would be "futile."  *Cuoco*, 222 F.3d at 112.

27

Drinks-Bruder requests leave to amend her complaint "if needed."  Docket Item 20 at 13.  In light of the above, Drinks-Bruder is granted leave to amend the following claims: (1) her failure to accommodate claim; (2) her Title VII race discrimination claim against the City; (3) her Title VII hostile work environment claim against the City; (4) her due process claim against Restaino, Mazur, Granto, Spagnolo, Lee, and Kerfoot; (5) her NYSHRL race discrimination claim; (6) her NYSHRL hostile work environment claim; and (7) her NYSHRL retaliation claim against Restaino, Mazur, Licata, Faso, Corcoran, Granto, Spagnolo, Lee, and Kerfoot.

Drinks-Bruder is advised that an amended complaint is intended to **completely replace** the prior complaint in the action and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)*; see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  Therefore, any amended complaint **must include all allegations against each of the defendants.**

Drinks-Bruder also is advised that she if she "hold[s] back and purposely submit[s] a deficient pleading," *see* Docket Item 29 at 3, many of her claims will not proceed.  The amended complaint must plead specific facts that correct the deficiencies identified in this decision.  Otherwise, the claims listed above will be dismissed.

## CONCLUSION

For the reasons stated above, the defendants' motions to dismiss, Docket Items 15 and 16, are GRANTED in part and DENIED in part.  The following claims may proceed: (1) the Title VII retaliation claim against the City; (2) the due process claims against the City, Faso, Licata, and Corcoran; (3) the NYSHRL retaliation claim against the City; and (4) the punitive damages claims against Faso, Licata, and Corcoran.  The

following claims are dismissed without leave to amend: (1) all Title VII claims against Restaino, Mazur, Licata, Faso, Corcoran, Granto, Spagnolo, Lee, and Kerfoot; and (2) the punitive damages claims against the City and the individual defendants in their official capacities.  And the following claims will be dismissed unless Drinks-Bruder files an amended complaint addressing the deficiencies noted above: (1) the failure to accommodate claim; (2) the Title VII race discrimination claim against the City; (3) the Title VII hostile work environment claim against the City; (4) the due process claim against Restaino, Mazur, Granto, Spagnolo, Lee, and Kerfoot; (5) the NYSHRL race discrimination claim; (6) the NYSHRL hostile work environment claim; and (7) the NYSHRL retaliation claim against Restaino, Mazur, Licata, Faso, Corcoran, Granto, Spagnolo, Lee, and Kerfoot.

Drinks-Bruder may amend the complaint **within 45 days of the date of this order**, and the defendants shall respond to any amended complaint within 30 days of the date it is filed.  If Drinks-Bruder does not amend the complaint, the City, Faso, Licata, and Corcoran shall answer the complaint within 75 days of the date of this order, and the Clerk of the Court shall terminate Restaino, Mazur, Granto, Spagnolo, Lee, and Kerfoot as defendants.

SO ORDERED.

Dated:   March 13, 2024
         Buffalo, New York


 */s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE